Exhibit "A"

United States Department of Agriculture



Food and Nutrition Service

Retailer and Issuance Policy and Innovation Division

Administrative Review Branch

1320 Braddock Place, Room 5042
Alexandria, VA 22314

Phone:
(703) 305-2344

Fax:
(844) 500-0387

Michelle.Waters@usda.gov

February 22, 2022

Miluska L. Novota
Hortensia PLLC
720 West Lake Street, Suite 412
Minneapolis, Minnesota 55408

Re: Case Number C0248523
Family Foods
3469 Minnehaha Avenue
Minneapolis, Minnesota 55406-2624

Dear Counselor:

Enclosed is the Final Agency Decision of the U.S. Department of Agriculture (USDA) Food and Nutrition Service in response to the request for administrative review dated October 22, 2021. The Final Agency Decision includes a statement regarding your right to judicial review.

The USDA Food and Nutrition Service finds there is sufficient evidence to support the Retailer Operations Division's determination to impose a permanent disqualification against Family Foods from participating as an authorized retailer in the Supplemental Nutrition Assistance Program.

Sincerely,

MICHELLE WATERS
Administrative Review Officer

Enclosure: Final Agency Decision


cc: Yassin M. Mustafa, Owner

USDA is an Equal Opportunity Provider, Employer and Lender

U.S. Department of Agriculture
Food and Nutrition Service
Administrative Review Branch

**Family Foods,**

**Appellant,**

v.

**Retailer Operations Division,**

**Respondent.**

Case Number: C0248523

## FINAL AGENCY DECISION

The U.S. Department of Agriculture (USDA) Food and Nutrition Service (FNS) finds there is sufficient evidence to support the determination by the Retailer Operations Division to impose a permanent disqualification of Family Foods ("Appellant") from participating as an authorized retailer in the Supplemental Nutrition Assistance Program (SNAP).

### ISSUE

The issue accepted for review is whether the Retailer Operations Division took appropriate action, consistent with Title 7 Code of Federal Regulations (CFR) Part 278, when it imposed a permanent disqualification against Family Foods.

### AUTHORITY

7 U.S.C. § 2023 and implementing regulations, at 7 CFR § 279.1, provide that "A food retailer or wholesale food concern aggrieved by administrative action under § 278.1, § 278.6 or § 278.7 . . . may . . . file a written request for review of the administrative action with FNS."

### CASE CHRONOLOGY

Family Foods was initially authorized to participate in SNAP on September 25, 2014. In a letter dated September 29, 2021, the Retailer Operations Division charged Appellant with trafficking, as defined in § 271.2 of SNAP regulations, based on a series of irregular SNAP transaction patterns that occurred between the months of February 2021 and July 2021 and information obtained during a visit to the store by an FNS contractor on July 16, 2021. The attachments enclosed with the charge letter specified the questionable and unusual SNAP transactions indicative of trafficking that were conducted at Appellant's firm during the review period. The letter noted that the penalty for trafficking is permanent disqualification, as provided by 7 CFR § 278.6(e)(1). It informed Appellant of the right to respond to the charges within 10 days of receipt

1

to explain the irregular SNAP transaction patterns and provided that Appellant may request a civil money penalty (CMP) in lieu of permanent disqualification for trafficking within 10 days of receipt of the charge letter, under the conditions specified in 7 CFR § 278.6(i).

Appellant responded to the trafficking charge on September 30, 2021, October 4, 2021, and October 12, 2021. Appellant submitted a spreadsheet of markup percentages for about 20 food items presumably sold at the store and cash register daily Z-tapes for the months of February 2021 through July 2021. In its responses to the charge letter, Appellant did not request a trafficking CMP in lieu of permanent disqualification and did not submit any store training or policy documents in support of this alternative penalty.

After considering Appellant's reply and further evaluating the evidence, the Retailer Operations Division concluded that trafficking had occurred as charged and issued a determination letter dated October 13, 2021. This letter informed Appellant that the firm would be permanently disqualified from SNAP upon receipt of the letter, in accordance with 7 CFR § 278.6(c) and § 278.6(e)(1). The letter also stated that Appellant was not eligible for a trafficking CMP in accordance with § 278.6(i) because Appellant failed to submit sufficient evidence to demonstrate the firm had established and implemented an effective compliance policy and program to prevent SNAP violations.

In a letter dated October 22, 2021, Appellant, through counsel, appealed the Retailer Operations Division's determination by requesting an administrative review. The request was granted. Additionally, Appellant was granted an extension to November 21, 2021, to provide any contentions and evidence in support of its case. Appellant did not submit any additional information timely. Appellant obtained new counsel on November 29, 2021.

## STANDARD OF REVIEW

In an appeal of an adverse action, the appellant bears the burden of proving, by a preponderance of the evidence, that the administrative action should be reversed. This means the appellant has the burden of providing relevant evidence which a reasonable mind, considering the record as a whole, would accept as sufficient to support a conclusion that the matter asserted is more likely to be true than not true.

## CONTROLLING LAW

The controlling law in this matter is found in the Food and Nutrition Act of 2008, as amended (7 U.S.C. § 2021), and promulgated through regulation under Title 7 CFR Part 278. In particular, 7 CFR § 278.6(a) and (e)(1)(i) establish the authority upon which a permanent disqualification may be imposed against a retail food store or wholesale food concern.

7 U.S.C. § 2021(b)(3)(B) states, in part:

```
[A] disqualification under subsection (a) shall be...permanent
upon...the first occasion or any subsequent occasion of a
disqualification based on the purchase of [SNAP benefits] or
trafficking in [SNAP benefits] or authorization cards by a
```

> retail food store or wholesale food concern or a finding of the unauthorized redemption, use, transfer, acquisition, alteration, or possession of EBT cards....

7 CFR § 271.2 states, in part:

> Eligible foods means: Any food or food product intended for human consumption except alcoholic beverages, tobacco and hot food and hot food products prepared for immediate consumption....
>
> Trafficking means:
> The buying, selling, stealing, or otherwise effecting an exchange of SNAP benefits issued and accessed via Electronic Benefit Transfer (EBT) cards, card numbers and personal identification numbers (PINs), or by manual voucher and signature, for cash or consideration other than eligible food, either directly, indirectly, in complicity or collusion with others, or acting alone....

7 CFR § 278.2(a) states, in part:

> [SNAP benefits] may be accepted by an authorized retail food store only from eligible households...only in exchange for eligible food. [SNAP benefits] may not be accepted in exchange for cash...[and] may not be accepted in payment of interest on loans or for any other nonfood use.

7 CFR § 278.6(a) states, in part:

> FNS may disqualify any authorized retail food store...if the firm fails to comply with the Food and Nutrition Act of 2008, as amended, or this part. Such disqualification shall result from a finding of a violation on the basis of evidence that may include facts established through on-site investigations, **inconsistent redemption data, [or] evidence obtained through a transaction report under an electronic benefit transfer system**.... Disqualification shall be for a period of 6 months to 5 years for the firm's first sanction; for [a] period of 12 months to 10 years for a firm's second sanction; and **disqualification shall be permanent for a disqualification based on paragraph (e)(1) of this section**. [Emphasis added.]

7 CFR § 278.6(b)(2)(ii) states, in part:

> Firms that request consideration of a civil money penalty in lieu of a permanent disqualification for trafficking shall have the opportunity to submit to FNS information and evidence... that establishes the firm's eligibility for a civil money penalty in lieu of a permanent disqualification in accordance

3

> with the criteria included in § 278.6(i). This information and evidence shall be submitted within 10 days, as specified in § 278.6(b)(1).

7 CFR § 278.6(b)(2)(iii) states:

> If a firm fails to request consideration for a civil money penalty in lieu of a permanent disqualification for trafficking and submit documentation and evidence of its eligibility within the 10 days specified in § 278.6(b)(1), the firm shall not be eligible for such a penalty.

7 CFR § 278.6(e)(1)(i) states, in part:

> [FNS] shall...disqualify a firm permanently if personnel of the firm have trafficked as defined in § 271.2.

7 CFR § 278.6(i) states, in part:

> FNS may impose a civil money penalty in lieu of a permanent disqualification for trafficking...if the firm timely submits to FNS substantial evidence which demonstrates that the firm had established and implemented an effective compliance policy and program to prevent violations of the Program.

7 CFR § 284.1 Pandemic Electronic Benefits Transfer (P-EBT) states in part:

> (a) Overview. Section 1101 of the Families First Coronavirus Response Act (FFCRA; Pub. L. 116-127), as amended, authorized supplemental allotments to certain households. These benefits shall be referred to as Pandemic Electronic Benefits Transfer (P-EBT) benefits …. This section establishes the retailer integrity regulations for P-EBT for retailers in any State as defined in Section 3(r) of the Food and Nutrition Act.
>
> (b) Definitions. For this section:
>
> (1) Trafficking means the activities described in the definition of trafficking at § 271.2 of this chapter when such activities involve P-EBT benefits.
>
> (2) Firm's practice means the activities described in the definition of firm's practice at § 271.2 of this chapter when such activities involve P-EBT benefits.
>
> (3) Involving P-EBT benefits or involve P-EBT benefits means activities involving PEBT benefits as well as supplemental nutrition assistance program (SNAP) benefits, or only P-EBT benefits.

4

(c) Participation of retail food stores and wholesale food concerns, and redemption of PEBT benefits. Requirements and restrictions on the participation of retail food stores and wholesale food concerns and the redemption of coupons described at §§ 278.2, 278.3 and 278.4 of this chapter, including the acceptance of coupons for eligible food at authorized firms, also apply to activities involving P-EBT benefits ….

(e) Penalties. For firms that commit certain violations described at §§ 278.6 and 278.2 of this chapter where such violations involve P-EBT benefits, FNS shall take the corresponding action prescribed at § 278.6 or § 278.2 for that violation. For the purposes of assigning a period of disqualification, a warning letter shall not be considered to be a sanction. Specifically, FNS shall:

(1) Disqualify a firm permanently, as described at § 278.6(e)(1)(i) of this chapter, for trafficking, as defined at § 284.1(b)(1) of this chapter, or impose a civil money penalty in lieu of permanent disqualification, as described at § 278.6(i) of this chapter, where such compliance policy and program is designed to prevent violations of regulations of this section ….

(6) Disqualify the firm for 1 year for credit account violations as described at §§ 278.6(e)(4)(ii) and 278.2(f) of this chapter, where such violations involve P-EBT benefits…. 5

(11) Impose a civil money penalty in lieu of permanent disqualification for trafficking as described at § 278.6(j) of this chapter in an amount calculated using the described formula at § 278.6(j), which shall also include the relevant amount of P-EBT redemptions when calculating the average monthly benefit redemptions….

(g) Administrative and Judicial review. Firms aggrieved by administrative action under paragraphs (d), (e), and (f) of this section may request administrative review of the administrative action with FNS in accordance with part 279, subpart A, of this chapter. Firms aggrieved by the determination of such an administrative review may seek judicial review of the determination under 5 U.S.C. 702 through 706.

## SUMMARY OF CHARGES

FNS charged Family Foods with trafficking based on an analysis of FNS records, which included observed store characteristics, recorded food stock, and store pricing gathered during a store visit, as well as Electronic Benefit Transfer (EBT) transaction data for February 2021 through July

5

2021. The attachments enclosed with the charge letter reflected the following transaction patterns, which commonly indicate trafficking:

- **Charge Letter Attachment 1:** A large number of transactions were made ending in a same cents value.
- **Charge Letter Attachment 2:** A large number of transactions were made in repeated dollar values.
- **Charge Letter Attachment 3:** Multiple transactions were made from the accounts of individual SNAP households within a set time period.
- **Charge Letter Attachment 4:** Transactions that were large based on observed store characteristics and recorded food stock.

## APPELLANT'S CONTENTIONS

Appellant's contentions regarding this matter, made through counsel, are summarized as follows:

- A permanent ban of the store to accept SNAP and other benefits from customers will greatly hamper the store's ability to stay open in a part of the city where residents need it most.
- The store owner has not engaged in "trafficking" and each of the cited transactions was legitimate.

In support of these contentions, Appellant submitted two spreadsheets. The first document the total amounts of inventory purchases from various vendors for the months February 2021 through July 2021. The second spreadsheet lists inventory purchases from Core-Mark for the same time period. A number of customers also emailed about the need for the store to remain SNAP authorized.

The preceding represents a brief summary of Appellant's contentions. However, in reaching a decision, full consideration has been given to all contentions presented, including any that have not been specifically listed here.

## ANALYSIS AND FINDINGS

This review examines the relevant information regarding the Retailer Operations Division's trafficking determination. The record must contain evidence sufficient to raise a presumption that trafficking occurred. In a trafficking determination, this evidence includes SNAP transaction data, considered together with other available information, such as store visit observations, the location and characteristics of competitor firms, and household shopping patterns. Once the presumption is established, Appellant bears the burden of providing relevant evidence to support a conclusion, considering the record as a whole that it did not engage in trafficking. If Appellant fails to show this, the case will be sustained.

Retailers are provided opportunities to submit evidence accompanied by explanations of the legitimacy of questionable transactions, both to the Retailer Operations Division and here on

administrative review. Without supporting evidence and rationale, assertions that the firm has not violated program rules do not constitute valid grounds for overturning the determination.

Based on the evidence in this case, the SNAP transactions listed in the September 29, 2021, charge letter were indicative of trafficking. Appellant has not provided reasonable explanations supported by sufficient credible and convincing evidence to demonstrate that these transactions were more likely due to reasons other than trafficking. Accordingly, the permanent disqualification is sustained. The Retailer Operation's Division's decision not to impose a trafficking CMP is also sustained as Appellant did not make a timely request. Discussed below are elements of the Retailer Operations Division record, Appellant's contentions, and the findings of this review.

## Store Visit Report

In reaching a disqualification determination, the Retailer Operations Division considered information obtained from a store visit conducted by an FNS contractor on July 16, 2021, to observe the nature and scope of the firm's operation, stock, and facilities. This store visit information was used to ascertain if there were justifiable explanations for the firm's irregular SNAP transaction patterns. The store visit report and photographs documented the following store size, description, and characteristics:

- The firm is a convenience store, approximately 1,440 square feet in size, with no storage outside of public view. The store did have storage coolers or freezers.
- The store had no shopping carts or shopping baskets for customers to use.
- The store had one cash register for food purchases and one EBT point-of-sale device.
- The firm used optical scanners to process transactions.
- The checkout area consisted of a small and cluttered counter space where items could be placed for purchase.
- The store's staple food stock met SNAP program eligibility requirements; the food selection was typical of a convenience store. The store did not sell specialty items such as bundles of meat or seafood or large boxes of fruit and vegetables.
- SNAP-eligible, non-staple, accessory food items available at the store included carbonated and uncarbonated drinks, snacks, candy, and condiments. The store also sold ineligible, nonfood items, including lottery tickets, tobacco products, cleaning products, housewares, paper goods, and has ATM or money transfer services.
- The store did not have a kitchen or food preparation area, nor did it appear to sell deli or prepared food items. The store did have a microwave for heating food.
- The firm did not have a special pricing structure, except that most prices appear to end in 9, such as $0.99, $1.99, etc.
- Store personnel confirmed that the store does not round prices up or down at checkout.
- Store personnel confirmed that no food was stored offsite.
- The store did not sell any specialty or international foods that would normally sell for a high price.
- The most expensive SNAP eligible food items for sale at the store included a 29-ounce box of Banquet fried chicken for $10.59; a 3-ounce bag of Matador jerky for

7

$6.99; a 2.85-ounce bag of Jack Links jerky for $6.99; a 48-ounce container of Blue Ribbon ice cream for $6.99; a 23.45 ounce package of Red Barron pizza for $6.50; and 18-ounce boxes of Post and Kellogg's cereals for $5.99.

The available inventory of SNAP-eligible food at the time of the store visit showed stock that is typical of a convenience store, where households normally purchase a limited number of items to complement their overall dietary needs. Given the store's inventory and characteristics, it appears unlikely that SNAP households would visit the store repeatedly or regularly to purchase large quantities of grocery items causing this store's redemption patterns to differ significantly from those of similarly sized competitors.

## SNAP Transaction Analysis

While SNAP households have no limit on the number of times they may use their SNAP card or how much eligible food they may purchase in SNAP transactions, government analyses have found that stores likely trafficking SNAP benefits have particular transaction patterns or characteristics that are inconsistent with the transaction patterns and characteristics of similarly situated stores. The Charge Letter Attachments specify the unusual transactions and transaction patterns found at Appellant's store, which are considered together with other available information, such as store visit observations, the location and characteristics of competitor firms, and household shopping patterns, to determine if the anomalies can be explained based on circumstances specific to the store.

**Charge Letter Attachment 1:** <u>A large number of transactions were made ending in a same cents value.</u> This attachment lists 91 same-cents transactions totaling $11,759.09 in SNAP benefits. There were a total of 375 SNAP transactions of $50 or more; of these large dollar transactions, around 91 (24%) ended in "99" cents. In other words, almost a quarter of these large transactions ended in "99" cents. Sets of repeating cent values is highly unorthodox and do not regularly occur in legitimate transactions. This type of pattern is a strong indicator that a store is trafficking SNAP benefits. This is particularly true when a store does not have a pricing structure that would likely result in a large number of transactions ending in a same cents value.

Appellant has offered no explanation for the large number of transactions ending in a same cents value at the store. The store visit report provided that prices at the store was typical of convenience stores, where individual items are priced to end in ".x9" cents. Also, the most expensive item for sale at the store was fried chicken priced at $10.59; other items were $6.99 or less. With such a pricing structure, it is unlikely for large transactions of $50 or more, which must necessarily include multiple items given the low-cost of most items in the store, to end in "99" cents so frequently.

To note, a number of households whose transactions were cited in other attachments to the charge letter also consistently made transactions that ended in same-cents values. Transactions appearing in more than one attachment to the charge letter are more suspicious as they display multiple patterns common to trafficking transactions.

Patterns of transactions ending in same-cents amounts indicate that SNAP transaction amounts are contrived. That various customers each repeatedly had totals with identical cents values during the review period strains the credibility of Appellant's contention that these transactions are legitimate. As Appellant has offered no rational explanation or evidence for the unusual transaction pattern at the store, it is reasonable to conclude that these same-cents transactions are the result of trafficking.

**Charge Letter Attachment 2:** <u>A large number of transactions were made in repeated dollar values.</u> This attachment lists 64 large purchase SNAP transactions totaling $8,697.80. Each of these transactions were for either $99 or $199 plus change, though 56 of the 64 transactions were for either $99.99 or $199.99. Like with same cents transactions, repeated same dollar transactions, particularly for large amounts, are unusual and can be a strong indicator that a store is trafficking SNAP benefits.

It is not uncommon for dollar values to repeat over the course of a six-month period. However, when certain dollar values are unusually repetitive, without a reasonable explanation, they can be an indicator of trafficking. Appellant has offered no explanation for the repeated large transactions in same dollar amounts at the store. Additionally, based on the store visit, the store does not have any specials or food packages that would result in large, repeated dollar amount purchases. Most items at the store are low-cost. As previously noted, the most expensive items at the store was frozen fried chicken priced at $10.59 and the next most expensive SNAP eligible items were priced at $6.99. Given Appellant's inventory, it would take a large number of items to total $99 or $199 and it would be very unlikely that large transactions of multiple items would end up repeatedly totaling the same dollar amounts. As Appellant has offered no rational explanation or evidence for the unusual transaction pattern, it is reasonable to conclude that these repeated dollar value transactions are the result of trafficking.

**Charge Letter Attachment 3:** <u>Multiple transactions were made from the accounts of individual SNAP households within a set time period.</u> This attachment lists 115 sets of transactions (314 transactions in all) totaling $29,103.02 in SNAP benefits, and averaging $92.68 per transaction, or $253.07 per set of transactions. These transactions were completed by 50 different households. Violating stores often conduct multiple transactions from the same household account in short time periods to avoid the detection of single high-dollar transactions that cannot be supported by the retailer's inventory, store type, or structure.

The transactions in Charge Letter Attachment 1 included sets of transactions that ranged from $76.18 to $719.28. Many of the sets of transactions were very large, including 2 sets for over $700 each; 4 sets for over $600 each; 2 sets for over $500 each; 10 sets for over $400 each; 12 sets over $300 each; and 36 sets for over $200 each. 17 sets took place in under one minute, including a set for $219.29 that took place in eight seconds and a set for $339.32 that took place in nineteen seconds. Given the low dollar value of most items in the store it would be very difficult to conduct transactions totaling these large dollar amounts in a matter of seconds. Five sets of transactions for $600 or more took place in around 24-hours or less, with the one for $649.71 taking place in less than 7 hours.

Although it is not uncommon for customers to have multiple transactions in a day or two, it is uncommon that, at a convenience store, such multiple transactions total large dollar amounts. The SNAP transactions noted in the charge letter are questionable not because they exceed any limits for use, but rather because they display characteristics of use inconsistent with the nature and extent of Appellant's stock and facilities and are therefore indicative of trafficking. The store visit report and photographs offer no explanation as to why SNAP customers would routinely shop at Appellant multiple times during a short period to purchase such a large volume of items, there being no great variety of products, price advantage, profusion of large packages, or significant bulk items for sale. Likewise, Appellant has offered no reasonable explanation for these unusually large transactions.

**Charge Letter Attachment 4:** <u>Transactions that were large based on observed store characteristics and recorded food stock.</u> This attachment lists 375 large purchase SNAP transactions totaling $38,817.18 for an average transaction amount of $103.51. As points of reference, in Hennepin County, the average SNAP transaction amount during the review period was $10.64, while for all counties in Minnesota, the average was $11.41. Appellant's average across all transactions was $22.79, which was 199.74% of the county average and 214.19% of the State average. The transactions in this attachment were 469.92% of the county average and 438.21% of the State average. Although Appellant is well stocked for a convenience store, the food stock and facilities of Appellant as reported in the store visit documentation do not appear sufficient to provide for all of one's food needs. People generally do not spend large sums at such stores. It is rare for a convenience store such as Appellant's to have purchases like those included in Charge Letter Attachment 4.

This attachment displays some very unusual household transaction activity. For example, the household which conducted the two largest transactions, each totaling $299.99 and taking place within six hours on the same day, also conducted three transactions totaling exactly $199.99 during the review period. Two of these transactions for $199.99 took place within 15 seconds on the same day. Another household conducted six transactions, each for $199.99, within a span of nine days. Given Appellant's available inventory, it is very unlikely that a household would spend almost $1200 at Appellant in such a short period of time. A third household conducted four transactions for $199.99 and one for $198.99 during the review period. Appellant did not stock difficult to find food items that or many expensive food items that would result in recurrent transaction totals as large as these. Likewise, it would be very difficult to arrive at the same large transaction totals recurrently given the low-priced inventory at Appellant's store.

Additionally, many of the charge letter transactions arrive at, or cluster around, certain dollar amounts in $50 increments (e.g. $99.99, $149.99, $199.99). Households typically shop to obtain a certain mix of food items, irrespective of the total cost (other than to remain within allotment balances), and do not strive to achieve a particular total. The purchase amount of multiple eligible food items in a single transaction typically approximates a random total rather than concentrating at particular dollar amounts. In the absence of any compelling rationale to the contrary, the pattern of clustering transactions around certain dollar levels is implausible and likely indicative of SNAP-benefit trafficking.

10

Based on the store layout, infrastructure, and available inventory, it is not credible that the Appellant would so frequently conduct large transactions closely resembling those typically found at a supermarket or superstore. Appellant is not set up to process high-dollar transactions, as indicated by its lack of equipment to facilitate large transactions and limited counter space. There are no legitimate bases for SNAP customers' unusual attraction to the firm such as a superior selection of staple foods, price advantages, package specials, bulk or promotional items, an extensive variety of otherwise unavailable ethnic food items, or special services rendered. Appellant failed to provide convincing evidence to establish the legitimacy of these excessively large transactions, such as itemized cash register receipts. Based on all of these factors discussed in this section, the large volume of transactions for high-dollar amounts is unlikely to indicate a pattern of legitimate food purchases.

**Competitor Stores**

The Retailer Operations Division reviewed the number of SNAP authorized retailers within a one-mile radius of Appellant to determine if households living near Appellant had access to other shopping options during the review period. Mapping showed 16 other SNAP authorized food stores within a one-mile radius, including a superstore, four supermarkets, and a large grocery store. This comparison demonstrates that households shopping at Appellant likely had access to larger stores that may have lower prices and better inventory. With these shopping options, it is unlikely that SNAP recipients would expend their SNAP benefits in large amounts at Appellant's convenience store, and that they would do so recurrently.

**Comparison with Similarly Situated Convenience Stores**

Given that there were a number of shopping options near Appellant, the Retailer Operations Division compared Appellant's transactions to those of four convenience stores located within a one-mile radius of Appellant that were SNAP authorized during the review period. Because the stores are close in proximity to Appellant, if the stores are similar in inventory and infrastructure to Appellant, then the sales patterns should be comparable.

In looking at the comparison stores, the Retailer Operations Division determined that Appellant was open 2.5 to 5 hours less than each of the comparison stores, and therefore would have fewer hours to conduct transactions. Despite having shorter hours, Appellant's average transaction amount of $22.79 was significantly higher than its competitors, which had average transaction amounts ranging from $11.23 to $12.08. Likewise, Appellant was the only store to have any transactions that met the parameters of Charge Letter Attachment 1. Appellant had 64 transactions that met the parameters of Charge Letter Attachment 2, while its three competitors had only 60 combined. Finally, Appellant had 115 transactions that met the parameters of Charge Letter Attachment 3 and 375 that met the parameters of Charge Letter Attachment 4, while its three competitors, combined, had 28 and 217 respectively. Appellant has provided no explanation for why its transactions would differ so significantly from similarly located convenience stores.

**Household Analysis**

In addition to determining if households had access to other shopping options, the Retailer Operations Division conducted a household analysis to determine if households shopping at Appellant actually shopped at larger stores during the review period. As noted above, larger stores usually have lower prices and better inventory. If households are shopping at larger stores, then they are less likely to conduct large transactions at Appellant.

The Retailer Operations Division found that of the 99 households identified in Charge Letter Attachment 4, 37.37% made a SNAP transaction at a superstore and/or supermarket the same days as making a transaction at Appellant; 61.62% made a transaction at these larger stores within one day of shopping at Appellant; and 76% made a transaction at these larger stores within three days of shopping at Appellant.

The analysis also included examples of four households with unusual shopping patterns at Appellant that also regularly shopped at larger stores. These examples included a household that lived 5.2 miles from Appellant that spent $438.65 in four transactions at Appellant over the course of two days, while spending just $151.53 in two shopping trips at a supermarket during the same timeframe. The average SNAP transaction for this household at all SNAP authorized stores during the review period was $58.95. For convenience stores besides Appellant, this household's average was $9.02, while for supermarkets and superstores it was $76.56. However, at Appellant, this household's average transaction amount during the review period was significantly higher at $104.81. There is no compelling reason for this extreme difference in average SNAP transaction amounts, particularly when this store is compared against much larger store types.

Another household selected by the Retailer Operations Division repeatedly spent more at Appellant when also shopping at supermarkets on the same day or within a few days. The household's address was located 6.9 miles from Appellant. In one instance, this household spent $188.02 at Appellant on the same day it spent only $79.94 at a supermarket. The supermarket was located 10.44 miles away from Appellant. On another occasion, the household spent $494.56 at Appellant on the same day it spent $9.59 at a superstore. The superstore was located 4.42 miles from Appellant. This household likely had transportation given the distances it travelled to shop at Appellant and at larger stores. Given the household's access to transportation and larger stores, it is unlikely the household would legitimately spend large amounts at Appellant.

The Retailer Operations Division's analysis demonstrated that households shopping at Appellant during the review period had access to larger stores. In addition, the households' behavior further indicates that the transaction patterns in the Charge Letter Attachments were suspect given their willingness to make large transactions at Appellant despite having access to and shopping at much larger stores that likely have better prices and are better stocked.

## Customer Affidavits

A number of customers sent emails in support of Appellant, describing the kindness of the store owner and the need for the store in the community.

Although customer affidavits attested to customers enjoying the proximity of Appellant to their homes, analyzed shopping patterns, as described previously, show that households shopping at Appellant, in fact, also shopped at larger, better stocked, and more competitively priced grocery stores, often on the same day. Additionally, the Retailer Operations Division conducted a search in the State administrative terminal using the names and address in these affidavits. Almost half of the households did not appear in the system, while one was found not to have shopped at Appellant during the review period. These anomalies raise doubts regarding these affidavits and therefore the statements have little probative value in the case.

Of the remaining households that were confirmed to have made transactions at the firm, all of the households made their largest dollar SNAP transactions at a supermarket or superstore. Seventy-five percent of the households made more transactions at supermarkets and/or superstores than at Appellant during the review period.

The customer affidavits submitted do not establish the legitimacy of the questionable transactions. Rather, it appears that even those who submitted affidavits have access to, and shop at larger, better stocked stores regularly. Additionally, the truth of customer statements cannot be verified. Customers engaging in trafficking transactions are unlikely to admit to this behavior. On the contrary, customer statements would be expected to attest to the legitimacy of questionable transactions regardless of whether they were, in fact, legitimate.

## Register Reports and Inventory Purchases

Appellant has submitted, in support of its case, daily z-tapes documenting the store's sales and two spreadsheets documenting inventory purchases. With regard to the daily z-tapes submitted by Appellant, these are very generic and do not detail the items sold by the firm and whether they are SNAP eligible. It is impossible to tell if the z-tapes reflect any legitimate purchase of SNAP eligible foods. Likewise, the two spreadsheets that purport to document inventory purchases are not supported by original or copies of invoices. Without such invoices, it is impossible to confirm the items, prices, amounts, ordered, or whether the orders took place during the review period.

## Hardship to Appellant

Appellant maintains that disqualification would pose a hardship to the firm and hamper its ability to stay open.

Economic hardship is a likely consequence whenever a store is permanently disqualified from SNAP participation. However, there is no provision in the SNAP regulations for reducing an administrative penalty on the basis of possible economic hardship to the firm resulting from such a penalty. To excuse Appellant from an assessed administrative penalty based on purported

economic hardship to the firm would render the enforcement provisions of the Food and Nutrition Act of 2008 and the enforcement efforts of the USDA virtually meaningless.

Moreover, giving special consideration to economic hardship to the firm would forsake fairness and equity to competing stores and other participating retailers who are complying fully with program regulations, and also to those retailers who have been disqualified from the program in the past for similar violations. Therefore, Appellant's contention that it will incur economic hardship due to an administrative penalty does not provide any valid basis for dismissing the charges or for mitigating the imposed penalty

### Hardship to SNAP Participants

Appellant asserts that disqualification would be a hardship to SNAP households who rely on the store. Customer emails also attest to this.

Some degree of inconvenience to SNAP households is inherent in the disqualification of any participating food store from SNAP, since the normal shopping pattern of such SNAP households may necessarily change due to the disqualification. Section 278.6(f)(1) of SNAP regulations provides for CMP assessments in lieu of disqualification in cases where disqualification would cause "hardship" to SNAP households because of the unavailability of a comparable participating retail food store in the area to meet their needs. However, this regulation also sets forth the following specific exception: "A CMP for hardship to SNAP households may not be imposed in lieu of a permanent disqualification." Because the matter at hand involves a permanent disqualification, this CMP for hardship is not applicable.

### Summary

This review finds that the attachments furnished with the charge letter adequately identify irregular patterns of SNAP transactions, thereby indicating that trafficking was likely taking place. The transactions listed in the charge letter are highly unusual and substantially different from comparable stores in the area. Based on these and other factors, such as the store's physical characteristics and inventory, the case for trafficking is convincing.

On review, the Appellant failed to prove, by a preponderance of the evidence, that the administrative action should be reversed. The Appellant has not offered sufficient and compelling evidence that the "unusual, irregular, and inexplicable" transactions and patterns cited in the charge letter were not caused by trafficking. In fact, the Appellant offered no reliable evidence to support its contentions regarding specific transactions listed in the charge letter. Given the totality of the record, this review finds the transactions listed in the charge letter attachments were, more likely than not, the result of trafficking violations committed by the Appellant. Therefore, the Retailer Operations Division's decision to impose a permanent disqualification against Family Foods is sustained.

## CIVIL MONEY PENALTY (CMP)

In the charge letter, the Retailer Operations Division informed Appellant of its right to request a trafficking civil money penalty in lieu of permanent disqualification under 7 CFR §278.6(i). The letter informed Appellant that it would need to both make the request and provide supporting evidence within 10 calendar days of receiving the charge letter and that no extension of time could be granted for making the request or for providing the required evidence. Any evidence submitted by Appellant would have to meet the regulatory criteria for a trafficking civil money penalty, as provided in 7 CFR §278.6(i).

Appellant did not timely request consideration for a trafficking civil money penalty, nor has Appellant submitted evidence that meets the regulatory criteria for the civil money penalty. Therefore, the Retailer Operations Division's determination that Appellant is ineligible for a trafficking civil money penalty in lieu of disqualification is sustained as appropriate pursuant to 7 CFR §278.6(i).

## CONCLUSION

The Retailer Operations Division's analysis of the EBT transaction record for Family Foods was the primary basis for its determination to permanently disqualify the retailer. This review finds this data provides substantial evidence that the questionable transactions during the review period had characteristics that are consistent with trafficking in SNAP benefits. Store visit photographs and documentation further support the trafficking determination. Appellant has not proven, by a preponderance of evidence, that the administrative action should be modified or reversed.

Based on a review of all the information available in this case, the determination by the Retailer Operations Division to impose a permanent disqualification against Family Foods, under the ownership of Yassin M. Mustafa, is sustained. Likewise, the Retailer Operations Division's determination that Appellant was ineligible for a trafficking CMP is sustained.

## RIGHTS AND REMEDIES

Applicable rights to a judicial review of this determination are set forth in Section 14 of the Food and Nutrition Act of 2008 (7 U.S.C. § 2023) and in SNAP regulations, at 7 CFR § 279.7. If judicial review is desired, the Complaint, naming the United States as the defendant, must be filed in the U.S. District Court for the district in which Appellant owner resides or is engaged in business, or in any court of record of the State having competent jurisdiction. If a Complaint is filed, it must be filed within 30 days of receipt of this decision.

Under the Freedom of Information Act, we are releasing this information in a redacted format as appropriate. FNS will protect, to the extent provided by law, personal information that could constitute an unwarranted invasion of privacy.

MICHELLE WATERS                                                                                       February 22, 2022
ADMINISTRATIVE REVIEW OFFICER